UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:04CV139

| | |
|---|---|
| RICHARD MASON, | ) |
| Plaintiff, | ) ORDER |
| v. | ) |
| ILS TECHNOLOGY, LLC, an Ohio Limited Liability Company, | ) |
| Defendant. | ) |

INTRODUCTION

This is a contract dispute between Plaintiff Richard Mason and his former employer, Defendant ILS, Technology, LLC, about whether a provision in a stock option agreement released all obligations of the defendant owed to the plaintiff as set forth in the original Employment Agreement. The defendant has properly removed this action from the State Court based upon diversity jurisdiction.[1] The plaintiff has brought two claims for relief, the first for breach of employment agreement, and the second for liquidated damages pursuant to the North Carolina Wage and Hour Act, N.C. Gen. Stat. §95-25.22 (a1). Both the plaintiff and the defendant have moved for summary judgment and filed the appropriate responses and replies.

As explained below, this case is governed by Ohio law. In applying Ohio law, the Court

---

[1] On December 18, 2006, this Court granted the defendant leave to amend its notice of removal (Doc. No. 31) to establish the requisite diversity between the plaintiff and all members of the defendant LLC.

1

finds that the release language applies only to the matter of stock options, and does not release the defendant of all obligations owed to the plaintiff. For the reasons stated below, the Court **GRANTS** the plaintiff's motion for summary judgment, except as to his claim for $100,000.00 in "deferred compensation" and as to his claim for liquidated damages, and **DENIES** the defendant's motion for summary judgment.

FINDINGS OF UNDISPUTED FACTS

Defendant ILS Technology, LLC is a wholly owned subsidiary of Park Ohio Holdings. Prior to September 2000, the plaintiff had been employed by IBM for the previous 25 years. In 2000, he held the position of Business Development Executive at IBM. The defendant was formed in 2000 when it acquired certain software assets from IBM.

The plaintiff was offered employment by the defendant, culminating in a written employment agreement dated September 26, 2000 (hereafter the "Letter Agreement"). This Letter Agreement provided for the following:

- Position: President of ILST. Base Salary: $300,000.00 per year.

- Bonus: Up to 50% of salary based on the Company exceeding its business plan.

- Vacation: One week in 2000 and three weeks annually thereafter.

- Stock options: To be awarded based on the Company's performance.

- Long term incentive/deferred compensation: Will be provided, designed to be delivered in a tax efficient manner, one million fifty thousand dollars ($1,050,000.00), to be an equity based award to be detailed in a term sheet to be delivered within thirty days of the date of the Letter Agreement.

- Additional Benefits: Included car allowance and medical insurance for five years

> after termination of employment.
>
> • Severance pay: A lump sum equal to one year's annual salary and a vesting of all outstanding options unless employment was voluntarily terminated by the employee or was terminated "for cause" as defined.
>
> • Controlling law: Ohio law.
>
> • The offer was contingent on closing of the purchase of certain IBM software.

(Doc. No. 10: Letter Agreement).[2]

After the sale of IBM software occurred, the plaintiff terminated his employment with IBM in 2000 and worked for the defendant as President until his termination on or about November 24, 2003. However, no incentive long term compensation plan was delivered within thirty days as specified by the Letter Agreement.

A document dated June 18, 2003, but executed July 24, 2003, entitled "Nonqualified Option Agreement" (hereafter the "Option Agreement") was signed by the parties. This Agreement granted the plaintiff an option to purchase up to 4.68% of the equity in the defendant and contained provisions with respect to vesting, forfeiture and the Company's right of repurchase.[3]

The plaintiff's employment was terminated on or about November 24, 2003 "without cause" as such term is defined in the Letter Agreement. Following this termination, the plaintiff filed this suit seeking the vesting of his five year health insurance benefit, his $300,000.00 in severance pay, full vesting of his options as outlined in the Letter Agreement, and $100,000.00 in "voluntarily

---

[2] Neither the plaintiff nor the defendant separately designate their exhibits, but rather group them as attachments to their memoranda.

[3] 4.68% is roughly equivalent to the $1,050,000.00 in the plaintiff's incentive/deferred compensation to which he was entitled pursuant to the Letter Agreement. (Doc. No. 12: Memorandum at 6).

deferred compensation." The defendant denies that any wages are due to the plaintiff under his Letter Agreement or otherwise.

## STANDARD AND CHOICE-OF-LAW

Summary judgment is appropriate where the Court determines that there is no genuine issue of material fact to be tried and the moving party is entitled to judgment as a matter of law. Fed. R. Civ.P. 56(c). In making that determination, the Court must be certain the record does not reveal any material factual disputes, resolving all ambiguities and drawing all permissible factual inferences in a light most favorable to the party against whom summary judgment is sought. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).

A federal court sitting in diversity applies substantive state law, including the choice-of-law rules of the state in which it sits. Klaxon v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941). North Carolina courts generally give effect to a contractual choice-of law-provision. Cable Tel Servs., Inc. v. Overland Contracting, Inc., 574 S.E.2d 31, 33-34 (N.C. Ct. App. 2002). It is undisputed that both the September 26, 2000 Letter Agreement and the June 16, 2003 Option Agreement contain a choice-of-law provision specifying the governance of Ohio law, the state of organization of the defendant. Therefore, the Court will apply Ohio law to the instant case.

## PARTIES' POSITIONS

The crux of the dispute boils down to the proper interpretation of Paragraph 22 of the Option Agreement:

> 22. <u>Entire Agreement; Modification</u>. This agreement constitutes the entire agreement between the parties *relative to the subject matter hereof*, and supersedes all proposals, written or oral, and all other communications between the parties *relating to the subject matter of this Agreement*, including without limitation, any Letter Agreement between the Company and Optionee. The parties agree that this

> Agreement shall constitute full and complete satisfaction of all obligations owed by the Company and its Affiliates to Optionee under any Letter Agreement between the Optionee and the Company and its Affiliates. Optionee does hereby release the Company and its Affiliates from any and all claims, demands, losses or causes of action of whatever kind of nature which the Optionee had, has or may have by reason of any matter arising out of relating to the Company's or its Affiliates' obligations under that certain Letter Agreement between the Optionee and the Company or its predecessors dated as of September 26, 2000. This agreement may be modified, amended or rescinded only by a written agreement executed by both parties.

(emphasis added) (Doc. No. 10: Non-Qualified Option Agreement, ¶ 22).

The defendant moves for summary judgment arguing that the employment relationship between the parties was governed by the June 16, 2003 Option Agreement, and that the clear language of the second and third sentence of Paragraph 22 expressly supersedes the Letter Agreement and releases any claims the plaintiff has pursuant thereto. The defendant omits by ellipsis the significant phrases "relative to the subject matter hereof" and "relating to the subject matter of this Agreement," in its quotation of this paragraph in its memoranda and emphasizes the second and third sentence in isolation. (Doc. No. 10: Memorandum at 4 and Doc. No. 20: Memorandum at 2).

The plaintiff moves for summary judgment arguing that the only appropriate interpretation of the Option Agreement, considering its title, internal references to a prior existing agreement, the references to the limited purpose of Paragraph 22, and its value, is that the Option Agreement is intended to supplant only the stock option and long term incentive portions of the Letter Agreement and not those portions dealing with position, salary, severance and entitlement to benefits, which are not addressed in the Option Agreement.

ANALYSIS

*1.     A Harmonious Reading of the Contract*

The Ohio Supreme Court has held that "[c]ommon words appearing in a written instrument will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument." Alexander v. Buckeye Pipe Line Company, 374 N.E.2d 146, 148 (Ohio 1978).

A court's construction of a contract "should attempt to harmonize all the provisions rather than produce conflict in them." Ottery v. Bland, 536 N.E.2d 651, 654 (Ohio Ct. App. 1987) (citing Farmers Natl. Gank v. Dealware Ins. Co., 94 N.E. 834 (Ohio 1911)); see also Lincoln Electric Company v. St. Paul Fire and Marine Insurance Company, 210 F.3d 672, 685 (6th Cir. 2000) (citing Bland for same). "In harmonizing apparently conflicting clauses of a contract, they must be construed so as to give effect to the intention of the parties as gathered from the whole instrument; and, where the object to be accomplished is declared in the instrument, the clause which contributes most essentially to that object will control." Mills-Carleton Co. v. Huberty, 95 N.E. 383, 383 (Ohio 1911); see also 66 Am. Jur. 2d Release §31 (2001) ("The scope of a release is determined by the intention of the parties as expressed through a release's terms considering all the facts and circumstances.") "To that end [of attempting to harmonize the entire contract], no provision of the contract should be ignored as inconsistent if there exists a reasonable interpretation which gives effect to both." Bland, 536 N.E.2d at 654; see also Ohio Historical Soc'y v. Gen. Maint. and Eng'g Co., 583 N.E.2d 340, 343 (Ohio Ct. App. 1989) ("Contract documents should be construed in their entirety to give effect to the intention of the parties") citing Skivolocki v. East Ohio Gas Co., 313 N.E.2d 374 (Ohio 1974); see also Restatement (Second) of Contracts §202(2) (1981) (same).

The Ohio Supreme Court has also provided that "[t]he construction of written contracts and instruments of conveyance is a matter of law." Buckeye Pipe Line, 374 N.E.2d at 148. It is therefore proper for this Court to construe the instant contract according to Ohio law and to apply the standards of summary judgment.

There are at least three ways in which the defendant's reading creates disharmony. First, and most significantly, the defendant's reading of the release language creates disharmony within Paragraph 22 itself. The first sentence of Paragraph 22 limits the scope of the Option Agreement by providing, "This Agreement constitutes the entire agreement between the parties *relative to the subject matter hereof*, and supersedes all proposals, written or oral, and all other communications between the parties *relating to the subject matter of this Agreement*, including without limitation, any Letter Agreement between the Company and Optionee." (emphasis added) (Doc. No. 10: Non-Qualified Option Agreement, ¶ 22). The defendant omits by ellipsis the italicized portion in an attempt to emphasize the release language of Paragraph 22. When one reads this sentence omitting the italicized portions, it is indeed more consistent with the release language of the second and third sentence. The Court, however, finds the portion omitted by ellipsis to be "the clause which contributes most essentially to that object" intended to be accomplished in the instrument. Huberty, 95 N.E. at 383. The "object" of the Option Agreement is stock options as indicated by the title of the agreement, the terms discussed throughout the agreement, the lack of reference to any other employment condition previously provided by the Letter Agreement, but most importantly, as indicated by the limiting language of "relative to the subject matter hereof" and "relating to the subject matter of this Agreement." Therefore, a harmonious reading of Paragraph 22 requires reading the release language of the second and third sentence in light of the first sentence.

7

Second, the defendant's reading creates disharmony between different provisions within the Option Agreement. Paragraph 18 recognizes the prior Letter Agreement as the controlling document for the terms and conditions of employment termination:

> 18.  <u>Employment-At-Will</u>.  Nothing in this Agreement is intended to be or may be construed as an offer, promise or commitment by the Company to extend or guaranty employment to the Optionee for any period of time, or, if the Optionee shall be employed by the Company, as a limitation on the right of the Optionee or of the Company to terminate the Optionee's employment at any time, with or without cause, *subject to the terms and conditions of any written contract of employment between the Optionee and the Company*.

(emphasis added) (Doc. No. 10: Non-Qualified Option Agreement, ¶ 18). The defendant's reading of the release language would effectively supercede the entire Letter Agreement, and yet simultaneously recognize it as retaining control over the conditions of termination. A harmonious reading between Paragraph 22 and Paragraph 18 is achieved, however, by applying a limited scope to the release language, which would give continued effect to the Letter Agreement, and would retain the relevance of Paragraph 18. This also gives effect to the object intended to be accomplished by the Option Agreement.

Third, the defendant's emphasis on the release language creates disharmony between the Letter Agreement and the Option Agreement by giving exaggerated effect to a single provision (the release language) in a document of limited scope (a stock option agreement) at the expense of all other employment arrangements contained in the Letter Agreement. A harmonious reading between the two documents results from applying a limited scope to the release language. The Option Agreement would then be consistent and harmonious with the terms and conditions of the Letter Agreement and the object of the Option Agreement would be accomplished.

This Court finds harmony between all the relevant documents and provisions therein by

reading the release language of the second and third sentence of Paragraph 22 as pertaining only to stock options. The Court finds that applying a limited scope to the release language is the "other meaning [that] is clearly evidenced from the face or overall contents of the instrument." Buckeye Pipe Line, 374 N.E.2d at 148. Therefore, the Court grants in part the plaintiff's motion for summary judgment as it applies to all wages claimed in his first claim of relief, except the $100,000.00 deferred compensation.

> 3. *Deferred Compensation*

In addition to the severance and other benefits claimed by the plaintiff, he also alleges that he is entitled to one hundred thousand dollars ($100,000.00) in "voluntarily deferred compensation." In his affidavit, the plaintiff provides as follows:

> 10. As a result of the business plan for the upcoming 2003 fiscal year, I conceived of and actively pushed for a temporary measure to ask employees to voluntarily reduce their salary for that year only in lieu of additional resource reductions. To lead the way, I offered to reduce my annual base compensation by one-third, that is $100,000, in order for the Company to achieve a better short term cash flow position. . . . It was never asked of me or discussed with me by Defendant to forgive or forego permanently this salary deferral. It was not my intention to eliminate this obligation of the Company to me or to waive my rights to such salary and compensation owed. This deferral was merely an accommodation to short term cash flow only.

(Doc. No. 13: Mason Affidavit, ¶ 10).

The defendant disputes this characterization as a "voluntary deferment" and instead argues that the salary decreases were an "across the board salary reduction," i.e., a reduction - not a deferment. (Doc. No. 20: Memorandum at 8-9 and Fogarty Affidavit, ¶ 9). They were permanent in nature, and the defendant argues it was never intended that these funds would be later reimbursed.

A genuine issue of material fact exists which survives summary judgment. Fed. R. Civ.P.

9

56(c). The Court therefore denies the plaintiff's motion for summary judgment in respect to his claim for $100,000.00 of what he has characterized as "deferred compensation."

### 4. *Wage and Hour Act Claims*

In his second claim for relief, the plaintiff argues that the defendant violated the North Carolina Wage and Hour Act, N.C. Gen. Stat. §95-25.22, by failing to pay owed wages. Although the contracts herein are governed by Ohio law, North Carolina law applies to all employees employed in this state. Talantis v. Paugh Surgical, Inc., 273 F.Supp. 2d 710, 713 (M.D.N.C. 2003). It is undisputed that the plaintiff was employed only in the State of North Carolina.

> North Carolina General Statutes, Section 95-25.22 provides the following in part:
>
> (a) Any employer who violates the provisions of G.S. 95-25.3 (Minimum Wage), G.S. 95-25.4 (Overtime), or G.S. 95-25.6 through 95-25.12 (Wage Payment) shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, their unpaid overtime compensation, or their unpaid amounts due under G.S. 95-25.6 through 95-25.12, as the case may be, plus interest at the legal rate set forth in G.S. 24-1, from the date each amount first came due.
>
> (a1) In addition to the amounts awarded pursuant to subsection (a) of this section, the court shall award liquidated damages in an amount equal to the amount found to be due as provided in subsection (a) of this section, provided that if the employer shows to the satisfaction of the court that the act or omission constituting the violation was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of this Article, the court may, in its discretion, award no liquidated damages or may award any amount of liquidated damages not exceeding the amount found due as provided in subsection (a) of this section.

"Thus, the employer bears the burden of demonstrating that liquidated damages should not be imposed. However, even if an employer shows that it acted in good faith, and with the belief that its action did not constitute a violation of the Act, the trial court may still, in its discretion, award liquidated damages in any amount up to the amount due for unpaid wages." Hamilton v. Memorex Telex, Corp., 454 S.E.2d 278, 285 (N.C. Ct. App. 1995); see also Ardnt v. First Union National

Bank, 613 S.E.2d 274, 283 (N.C. Ct. App. 2005) (same).

The plaintiff argues that the defendant acted in bad faith by: 1) unreasonably interpreting a poorly drafted document to strip the rights away from an employee who had been persuaded to leave a 25 year career for benefits set forth in a written agreement; 2) considering the plaintiff's termination before it offered him the Option Agreement; and 3) inserting ambiguous language in the Option Agreement which was used to trick him into foregoing his severance pay. (Doc. No. 12: Memorandum at 12 -13).

The defendant argues for its own good faith and reasonableness. The most explicit attempt to show good faith is in its sixth and eighth defense, (Doc. No. 2: Answer), yet "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading," Fed. R.Civ. P. 56(e). While arguments for good faith and reasonableness are absent from the defendant's argument pertaining to the Wage and Hour Act claim,[4] the defendant does proffer the Affidavit of Patrick Fogarty, Director of Corporate Development of Park Ohio Industries, Inc. (parent company of the defendant). Fogarty testifies that negotiations between the parties to the Option Agreement took place over a five-month period in 2003, both parties were represented by counsel, these negotiations were conducted in good faith, and that these negotiations made clear the intent to release all obligations under the previous agreement. (Doc. No. 20: Fogarty Affidavit, ¶¶ 5-6). Additionally, Fogarty testified that the possibility of terminating the plaintiff had been discussed previous to the signing of the Option Agreement, but the idea was rejected in the hope that the company would

---

[4] In a sub-section of the defendant's breach of contract argument, the defendant points out that the plaintiff was represented by counsel and that discussions were had about the Option Agreement superceding the Letter Agreement. (Doc. No. 20: Memorandum at 7). However, under the section pertaining to the Wage and Hour Act, the defendant only argues that Act does not apply if the defendant is not in breach of the employment contract. (Doc. No. 20 at 7-8).

become more profitable. In the end, this did not prove to be the case, which resulted in the plaintiff's termination. (Id. at ¶ 8).

While "[d]istrict courts are not required to ferret through sloppy records in search of evidence supporting a party's case," Mercado-Alicea v. P.R. Tourism Co., 396 F.3d 46, 51 (1st Cir. 2005), Peters v. Renaissance Hotel Operating Co., 307 F.3d 535 (7th Cir. 2002) ("it is not the responsibility of this court to ferret through the record for support for [the party's] arguments"), the Court does find within the Fogarty Affidavit sufficient evidence to withstand the plaintiff's summary judgment motion on the issue of good faith and reasonable grounds for withholding the plaintiff's wages. In reading the facts pertaining to the negotiations over the Option Agreement in a light most favorable to the defendant as the non-movant, the Court can not conclude that the defendant failed to meet its minimal burden at this stage to show some evidence of good faith and reasonableness. N. C. Gen.St. § 95-25.22 (a1). This matter therefore survives summary judgment. Since this issue is for the Court's review, not the jury's, a bench trial on the issue will be held on a date to be determined. N.C. Gen. Stat. §95-25.22 (a1).[5]

## CONCLUSION

After assessing the evidence according to the summary judgment standard, the Court finds that the plaintiff's motion for summary judgment should be granted in part, and the defendant's motion for summary judgment denied.

---

[5] N.C. Gen. Stat. §95-25.22 (a1) provides that " . . . the court shall award liquidated damages. . . ." The North Carolina Appeals Court has provided that "[t]he North Carolina Wage and Hour Act is modeled after the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 (1938)." Laborers' International Union of North America, AFL-CIO v. Case Farms, Inc., 488 S.E.2d 632, 634 (N.C. Ct. App. 1997). "In view of the express statutory language included in [the FLSA], it has been held on numerous occasions, and there can be no disagreement, that the statute does provide for the award of discretionary liquidated damages by 'the court.' " 26 A.L.R. Fed. 607 § 5. (internal citations omitted).

**IT IS, THEREFORE, ORDERED** that:

1. The defendant's motion for summary judgment (Doc. No. 9) is **DENIED**;

2. On his first claim for relief, the plaintiff's motion for summary judgment (Doc. No. 11) is **GRANTED** as to his one year annual income severance pay, the vesting of his five year health insurance coverage, and the vesting of all outstanding options, pursuant to N. C. Gen.St. § 95-25.22 (a), but is **DENIED** as to the $100,000.00 "deferred compensation"; and,

3. On his second claim for relief, the plaintiff's motion for summary judgment (Doc. No. 11) is **DENIED** as to the claim for liquidated damages pursuant to N. C. Gen.St. § 95-25.22 (a1).

Signed: April 11, 2007

Robert J. Conrad, Jr.
Chief United States District Judge